THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE WRIGHT, Defendant-Appellant.

First District (3rd Division)    No. 1—95—2544

Opinion filed November 27, 1996.—Modified on denial of rehearing February 26, 1997.

Rita A. Fry, Public Defender, of Chicago (Frederick Weil, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Peter Fischer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAHILL delivered the opinion of the court:

A jury found Willie Wright guilty of first degree murder and attempted armed robbery. The trial court sentenced him to 60 years in prison for first degree murder and 8 years for attempted armed robbery, the sentences to run consecutively. Wright appeals. We affirm the murder conviction but vacate the conviction for attempted armed robbery.

On November 20, 1991, Kahil Cuyler was beaten and shot to death near 658 E. 81st Street in Chicago, Illinois. At Wright's trial an eyewitness, Michella Henderson, testified that on November 20, 1996, she and her sister, while driving down 81st Street, saw three men fighting in the street. Two men were on either side of the third man, punching him. One of the assailants displayed a gun. Henderson then heard a shot. The beaten man fell to the ground. The assailants then got into a car on 81st and left the scene. Henderson telephoned 911, told the police what had happened, and gave the license plate number of the car. Henderson testified that she later identified Tanzell Eaton in a lineup as a man who strongly resembled the shooter. The lineup was held on November 22, 1996, and included the defendant, Willie Wright. Henderson did not identify Wright.

Officer Carlassare testified that while investigating the shooting he learned that the car identified by Henderson was registered to Tanzell Eaton. Eaton was taken into custody approximately 22 hours after the shooting and questioned.

Officer Malkowski testified at the hearing on Wright's motion to quash arrest and suppress evidence that Eaton told police that "two co-companions, one Mr. Willie Wright and Mr. Hampton, set out to rob Kahil Cuyler and a struggle ensued between Mr. Wright and Mr. Cuyler and Mr. Wright shot Mr. Cuyler in the head."

Several police officers then went to 17 West 103rd Street to arrest Wright. Officers knocked on the door and Wright opened it. The officers announced they were the police and asked Wright his name. Wright then slammed the door. Police Sergeant Wolf knocked on the door again. Wright's mother, Velma Wright, answered the door. Sergeant Wolf testified that he told Mrs. Wright the police were investigating a shooting. Officer Easter testified they told her the police were there to talk to and arrest her son. They said they knew Wright was there and asked if they could come in. Mrs. Wright stepped back to let Sergeant Wolf and other officers enter. Six officers entered the kitchen. They had no warrant. While the other officers searched the house, Sergeant Wolf asked Mrs. Wright if she would sign a consent to search form. Wolf did not bring consent forms with him. He wrote one out on a piece of paper Mrs. Wright gave him. Mrs. Wright retrieved her glasses so she could read the form. She then pointed out that Sergeant Wolf had misspelled her name. After that was corrected she read and signed the form.

Officer Phil Paluch was one of the officers who searched the house. He found Wright crouched in a corner of the basement crawl space. Wright was removed at gunpoint from the basement, handcuffed, and taken into custody.

During the pretrial suppression hearing, Mrs. Wright testified to a different version of events. She testified that at 6:30 p.m. on November 21 she was asleep because she works nights. She heard a lot of banging on the side door. She went downstairs and asked who was at the door. A voice said "police." She opened a security door and a plain-clothed police officer showed her a badge. One of the several police officers said they wanted to speak with Wright. He did not say they wanted to arrest him or search for a gun. She said she did not know if he was home because she had been asleep. She told the police she would go downstairs to see if her son was home but they pushed her back and came in. She did not give the police permission to enter and they had no warrant. They searched the home. When she asked the police for a warrant, they said they did not need one. Two officers went downstairs and came back with Wright in handcuffs. She testified that at one point she went downstairs and saw one of the officers with a knee in Wright's back and a gun at his head. She said she never had her glasses so she never read the consent form. She was told it was a paper stating that the police did not damage the house. She said she did initial a correction to the spelling of her name.

The trial judge found the police officers more credible than Mrs. Wright and denied Wright's motion to quash arrest and suppress evidence.

At trial, Detective Karl testified that he spoke to Wright when he was in police custody. Wright told him that Eaton told Wright and Hampton that they were going to rob Cuyler. When the three saw Cuyler, Wright went up to him with a gun and fired it once into the air. Wright and Cuyler then fought. Eaton joined the fight and hit Cuyler in the face, then took the gun from Wright and fired three times at Cuyler. The assailants then left the scene.

■ Wright first contends that the trial court erred in denying his motion to quash arrest and suppress statements for lack of probable cause.

The State argues that Wright waived the issue because he failed to raise probable cause arguments at the hearing.

We find that the issue of probable cause is not waived. The trial court made a finding that probable cause existed based upon the evidence it heard. There is also sufficient testimony in the preliminary hearing transcript to permit us to address and resolve the issue.

Probable cause exists when a reasonably prudent person, having the knowledge possessed by the officer at the time of the arrest, would believe that the defendant committed the offense. *People v. Montes*, 192 Ill. App. 3d 874, 549 N.E.2d 700 (1989).

Officer Malkowski testified at the motion to suppress hearing that Eaton made a statement that "two co-companions," Wright and Hampton, set out to rob the victim, and that Wright shot the victim in the head. Wright argues that Eaton's "co-companion" statement is insufficient to establish probable cause to arrest Wright.

Wright's argument is based on the theory that Eaton's statement should not be read to imply his presence at the crime scene. His statement, then, would be nothing more than a remark of an unreliable informant and, so, insufficient to establish a predicate for probable cause.

We disagree. The defendant's argument is predicated upon the interpretation of Eaton's "co-companion" statement in such a way as to exclude him from the scene of the crime. Defendant points out that eyewitness Henderson reported that there were two men involved in the crime. Since Eaton mentioned Wright and Hampton in the same breath with "co-companions," defendant concludes that the police could not have looked upon Eaton as a third perpetrator.

Defendant's analysis ignores the substance of Eaton's statement and that the police, given the context of the statement, could reasonably understand "co-companions" to include Eaton. Given Eaton's knowledge of what happened at the crime scene, it was not unreasonable for the police to infer that he was present.

Further, the theory ignores Wright's flight from police when they

appeared at his door and identified themselves. *People v. Jones*, 196 Ill. App. 3d 937, 956, 554 N.E.2d 516 (1990) ("It is well established that a defendant's flight from police can be considered as an additional factor in determining probable cause").

■ Second, Wright argues that the State failed to prove beyond a reasonable doubt that he was guilty of attempted armed robbery. He contends that there was no evidence independent of his statement that the offense was committed, a requirement under Illinois law to establish proof of *corpus delicti.*

The State contends that evidence other than Wright's confession exists to establish the commission of attempted armed robbery. Alternatively, the State argues that the requirements of *corpus delicti* should be clarified to allow a less stringent standard: independent evidence need not be offense specific.

*Corpus delicti* has two components: proof of the occurrence of the injury or loss and causation by criminal conduct. *People v. Furby*, 138 Ill. 2d 434, 563 N.E.2d 421 (1990). Proof of *corpus delicti* may not rest exclusively on a defendant's extrajudicial confession, admission, or other statement. The defendant's statement must be corroborated with evidence independent of the confession which tends to show the commission of the offense. *People v. Lambert*, 104 Ill. 2d 375, 378, 472 N.E.2d 427 (1984); *People v. Furby*, 138 Ill. 2d 434, 446, 563 N.E.2d 421 (1990).

The State cites to *People v. Montes*, 192 Ill. App. 3d 874, 549 N.E.2d 700 (1989), and argues, not without reason, that the case appears to stand for the proposition that the independent evidence need not establish the specific elements of the offense. *Montes*, however, predates the thorough discussion of the issue by our supreme court in *Furby*.

The court's analysis in *Furby* followed traditional notions of *corpus delicti*:

> " '[I]f the independent evidence *tends* to prove that an offense occurred, then such evidence, if corroborative of the facts contained in the confession, may be considered along with the confession in establishing the *corpus delicti*. In such event, the independent evidence need not establish beyond a reasonable doubt that an offense did occur.' " (Emphasis in original.) *Furby* 138 Ill. 2d at 446, quoting *People v. Willingham*, 89 Ill. 2d 352, 361 (1982).

The State would have us read this language liberally, from the State's point of view, and find that, if the independent evidence generally corroborates the confession, it need not rise to the level of proof required to establish the elements of the specific crime charged—which would be the case if no confession existed. *Furby*

does not so hold. The court in *Furby* analyzed the independent evidence, not with an eye to whether it tended to buttress the confession as a whole, but to whether it established or tended to establish the specific crime charged: felony theft. It found the independent evidence to be specific enough to relate to felony theft and concluded that the *corpus delicti* had been established.

Here, we only have the statement attributed to Eaton in Wright's confession, which tends to prove attempted armed robbery. No other evidence offered at trial, independent of Wright's confession, establishes or tends to establish the crime of attempted armed robbery. The eyewitness testified she told the police that she saw three men fighting in the street, that one man was shot, and that the others fled in a car. Nothing in this scenario establishes or tends to establish that the assailants intended to rob the victim. An inference of attempted armed robbery is no more credible than an inference that a drug transaction was involved. We find that the conviction for attempted armed robbery must be reversed for failure to establish proof of *corpus delicti*.

Alternatively, the State asks us to relax or dispense with the rule entirely. The State made no such request in *Furby*, so the court did not address the issue. *Furby*, 138 Ill. 2d at 447. We decline. If our supreme court wishes to revisit the *corpus delicti* rule, the State has preserved the issue in this appeal.

■ Finally, Wright argues that the trial court abused its discretion when it imposed the maximum sentence without consideration of a capacity for rehabilitation, the mitigation offered by Wright, his low IQ, the fact that the shooting was not planned, and that he did not shoot the victim.

We will not disturb a sentence unless we find the trial court abused its discretion. *People v. Streit*, 142 Ill. 2d 13, 19, 566 N.E.2d 1351 (1991).

Before sentencing the judge explained to Wright that he considered mitigating factors in determining the sentence. In part, he considered Wright's statement, his mother's plea for leniency, the extent of his involvement in the shooting, his past job history, and that he has a daughter. There is no evidence in the record that the trial court abused its discretion in the sentence imposed.

Affirmed in part and reversed in part.

THEIS and O'BRIEN, JJ., concur.